**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES THAYER, | ) | CASE NO. 3:15-CV-00003 |
| | ) | |
| Plaintiff, | ) | JUDGE CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, James E. Thayer ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his continuing disability and applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.   PROCEDURAL HISTORY

After sustaining multiple injuries from a car accident, including traumatic brain damage, Plaintiff was found disabled on April 1, 1994. (Tr. 25, 137.)  Benefits were awarded because Plaintiff's impairments met the severity of the Listing for organic mental disorders.  In the years following the initial finding of disability, this case

developed a long and complex procedural history:

> Subsequent to the April 1, 1994 determination, the claimant was
> determined to be disabled at various continuing disability reviews.  The
> most recent favorable decision finding the claimant disabled was a
> continuing disability review determination (CDR) dated, March 23, 2000.
> On July 29, 2005, however, it was determined that the claimant was no
> longer disabled as of May 1, 2005.  That determination was upheld by a
> State Agency Disability Hearing Officer, who found that the previous
> March 2000 CDR determination was made in error and noted that a group
> one exception to medical improvement applied.  Upon continuing disability
> review, an Administrative Law Judge found that the claimant's disability
> had ended due to medical improvement on May 1, 2005, did not address
> the group one exception, and issued a decision on September 15, 2008.
>
> The September 15, 2008 Administrative Law Judge decision was
> appealed, and the Appeals Council remanded the case and directed the
> Administrative Law Judge comply with AR 92-2(6) requiring consideration
> of all evidence of record through the date the decision was issued, as well
> as to give the claimant an opportunity for a new hearing and to submit
> additional evidence.
>
> In addition, while the claimant's prior unfavorable decision was going
> through the Appeals Council process, on September 24, 2008, the
> claimant filed a subsequent Title II application for a period of disability and
> disability insurance benefits and a Title XVI application for supplemental
> security income.  In both applications, the claimant alleged disability
> beginning September 12, 2008.  These claims were denied initially on
> January 14, 2009, and upon reconsideration on June 26, 2009.
> Thereafter, the claimant filed a written request for a hearing on August 25,
> 2009.  In its first remand order, the Appeals Council directed the
> Administrative Law Judge to associate these subsequent 2008 claims with
> the remanded claim.
>
> These claims were then consolidated and the claimant had an opportunity
> for a second hearing held on September 16, 2010.  On March 24, 2011,
> after the second hearing, the Administrative Law Judge issued a decision
> find that the claimant's disability had ended due to medical improvement
> on May 1, 2005.  This decision further found that the claimant was not
> disabled, based on his September 24, 2008 application for disability,
> disability insurance, and supplemental security income benefits.
>
> Following this decision, the claimant filed a second appeal to the Appeals
> Council and the claimant filed an additional application for disability and
> disability insurance benefits and supplemental security income on May 13,

2

> 2011.  The claimant alleged disability beginning March 25, 2011.  These additional claims were denied initially on September 1, 2011, and upon reconsideration on June 4, 2012.  Thereafter, the claimant filed a written request for a hearing on August 3, 2012.  A hearing was held on July 3, 2013.
>
> However, two days after the July 3, 2013 hearing, on July 5, 2013, the Appeals Council remanded the claimant's previous consolidated claims.  Further, in its second remand order, the Appeals Council directed the ALJ to determine whether to consolidate all of claimant's outstanding claims.

(Tr. 25-26.)

On October 8, 2013, an ALJ held a hearing to supplement the July 3, 2013 administrative hearing. (Tr. 1828-65.)  Plaintiff participated in the hearing, was represented by counsel, and testified. (*Id*.)  On January 13, 2014, the ALJ found Plaintiff's disability ended on March 23, 2000, and that Plaintiff had not become disabled again since that date. (Tr. 47-48.)  In making the decision, the ALJ consolidated all of Plaintiff's outstanding claims for benefits, including the following: Plaintiff's appeal of the original cessation of his disability benefits, which was issued on May 1, 2005; Plaintiff's Title II and Title XVI claims for benefits, which were filed on September 24, 2008; and Plaintiff's Title II and Title XVI claims for benefits, which were filed on May 13, 2011. (Tr. 26.)  On November 5, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 17-19.)

On January 2, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this matter. (Doc. Nos. 13, 16, 17.)  Plaintiff asserts the following assignment of error: the ALJ erred in omitting consideration of the content of Dr. Damrauer's psychological evaluation and

3

test data.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 44-years-old and considered a younger individual for social security purposes on the date the ALJ rendered his decision.  (Tr. 35.)  Plaintiff had at least a high school education and was able to communicate in English.  (Tr. 46.)  He had no past relevant work.  (*Id*.)

### B.    Medical Evidence

Plaintiff challenges only the mental aspect of the ALJ's disability determination. As a result, the Court will focus on evidence relating only to Plaintiff's mental impairments.

In 1993, Plaintiff was involved in a motor vehicle accident and sustained a severe traumatic brain injury. (Tr. 256.)  He was hospitalized in a rehabilitation unit from December 3, 1993, through February 1, 1994. (Tr. 266.)  Given Plaintiff's cognitive functioning at discharge, he required ongoing 24-hour supervision, and his prognosis for continued improvements was fair. (Tr. 267.)  Speech pathologist Naomi Hashimoto, M.S., noted that Plaintiff was fairly uncooperative throughout his rehabilitation unit stay, frequently refusing to do many of the tasks presented or intentionally providing inaccurate responses. (*Id.*)  In March 1994, occupational therapist Pam Van Burden indicated that Plaintiff's memory was poor, he required supervision for daily living tasks, his cognition was difficult to assess because he was uncooperative, and he had poor attentive skills. (Tr. 257-60.)

4

Approximately six years later, on February 8, 2000, state agency psychologist James Tanley, Ph.D., conducted a consultative psychological examination of Plaintiff. (Tr. 330-34.)  On the Wechsler Adult Intelligence Scale (WAIS-II), Plaintiff scored in the low average range of intelligence, with a full scale I.Q. score of 89, a verbal I.Q. score of 93, and a performance I.Q. score of 84. (Tr. 333.)  Dr. Tanley diagnosed a cognitive disorder and anxiety disorder and assigned a Global Assessment of Functioning (GAF) score of 65.[1] (*Id.*)  Dr. Tanley opined that Plaintiff was mildly impaired in his ability to relate to others and moderately impaired in his ability to withstand the stress and pressure of daily work. (*Id.*)  Plaintiff could understand and follow simple instructions and maintain attention to perform simple, repetitive tasks. (*Id.*)

During March 2005, consultative psychologist Roger Avery, Ed.S., evaluated Plaintiff and issued a disability assessment report. (Tr. 358-62.)  Plaintiff reported that he liked to be around people and had friends, though he currently lived on his own. (Tr. 360-61.)   Plaintiff denied using any illegal drugs but drank a 12 pack of beer on the weekends and smoked cigarettes every day. (Tr. 361.)  In terms of daily activities, Plaintiff went shopping, was his own representative payee, watched television, was unable to read because vision issues made him unable to concentrate, cared for his personal needs, washed clothes and dishes, cleaned, and prepared meals. (*Id.*)  After a

---

[1]  The GAF scale rates an individual's overall psychological functioning from 0 for inadequate information to 100 for superior functioning. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF score between 61 and 70 represents some mild symptoms or some difficulty in social or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

5

clinical interview, Dr. Avery opined that Plaintiff appeared to be functioning in the upper end of the low average range of intellectual functioning. (*Id.*)  The psychologist diagnosed major depressive disorder and dementia due to head trauma. (*Id.*)  Dr. Avery opined that Plaintiff's abilities to relate to others and remember, understand, and follow directions were mildly impaired. (Tr. 362.)  Plaintiff had mild to moderate problems withstanding stress associated with work. (*Id.*)  Dr. Avery concluded that Plaintiff could perform simple, repetitive tasks. (*Id.*)

State agency psychologist Carl Tishler, Ph.D., reviewed the record to assess Plaintiff's mental limitations in May 2005. (Tr. 376-89.)  Dr. Tishler indicated that Plaintiff had the organic mental disorder of dementia due to head trauma, as well as major depressive disorder. (Tr. 377, 379.)  Dr. Tishler opined that Plaintiff could perform multi-step tasks. (Tr. 388.)  The psychologist concluded that medical improvement had been shown since Plaintiff's award of benefits and Plaintiff was no longer disabled. (*Id.*)

In November 2005, state agency reviewing psychologist Guy Melvin, Ph.D., reevaluated the record. (Tr. 390-403.)  The psychologist opined that Plaintiff's mental limitations "would not significantly interfere with his ability to do work." (Tr. 402.)

On October 27, 2008, consultative examiner K. Roger Johnson, M.Ed., assessed Plaintiff's mental status and intellectual functioning. (Tr. 1739-44.)  Plaintiff reported that he smoked marijuana about once a month, and used to smoke every other day, until he moved back in with his father. (Tr. 1740.)  Plaintiff had stopped living independently when he lost his disability benefits. (Tr. 1741.)  His activities of daily living consisted of self-care, playing with dogs, yard work, splitting wood, attending alcoholics anonymous

meetings with his father, and seeing his girlfriend most weekends. (*Id.*)  A mental status examination revealed mild signs of depression, but Plaintiff's speech was normal, he had a logical thought process, and he exhibited some insight into his problems. (*Id.*) Mr. Johnson administered the WAIS-III on which Plaintiff obtained a full scale I.Q. score of 96, a verbal I.Q. score of 96, and a performance I.Q. score of 94. (Tr. 1742.)  Mr. Johnson diagnosed dementia due to head trauma, cannabis-related disorders, and alcohol-related disorders. (Tr. 1743.)  He assigned a GAF score of 70. (*Id.*)

Mr. Johnson concluded that Plaintiff could relate to co-workers and supervisors for simple, repetitive tasks and for some more complicated or detailed verbal instructions and procedures. (*Id.*)  Plaintiff's ability to understand, remember, and follow instructions was not impaired. (*Id.*)  His mental ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks was mildly impaired, as was his ability to withstand work stress and pressure. (Tr. 1743-44.)

On October 28 and October 31, 2008, psychologist Beverly Damrauer, Ph.D., conducted a psychological evaluation of Plaintiff on his attorney's referral. (Tr. 1318-25.)  Plaintiff reported that he had not been receiving mental health treatment and was feeling "more and more" depressed and withdrawn. (Tr. 1320.)  Dr. Damrauer stated Plaintiff's speech was within normal limits and there was no evidence of a thought disorder, but Plaintiff's mood was dysphoric and he "was negative about himself and his life." (Tr. 1322.)  Plaintiff's judgment and insight were poor, even though he was polite and cooperative. (*Id.*)  Dr. Damrauer explained that Plaintiff attempted to answer all questions, but it was necessary to ask follow up questions and probe. (*Id.*)  The

7

psychologist wrote that "those engaged in day to day conversation with [Plaintiff] might consider him reasonably conversational and knowledgeable without knowing more that underlies things." (*Id.*)

Dr. Damrauer administered the WAIS-II to evaluate Plaintiff's intellectual and cognitive abilities. (Tr. 1322.)  Plaintiff received a full scale I.Q. score of 80, a verbal I.Q. score of 83, and a performance I.Q. score of 81. (*Id.*)  These results placed Plaintiff in the lower end of the low average range of intelligence. (Tr. 1324.)  Plaintiff was also given the Wide Range Achievement Test (WRAT-4) to assess academic achievement levels, and his overall performance was in the average to low average range. (*Id.*)  To evaluate Plaintiff's mood and personality functioning, Dr. Damrauer administered a number of test, including the Test of Memory Malingering (TOMM), the Beck Depression Inventory, the Beck Anxiety Inventory, and a test for attention deficit hyperactivity disorder (ADHD). (Tr. 1323-24.)

Dr. Damrauer concluded that Plaintiff was not employable and that he presented "with a very mixed clinical picture that speaks in combination to serious psychopathology." (Tr. 1324.)  She wrote:

> Intellectual/cognitive testing places him overall at the low end of the low average range of intelligence, but his I.Q. scores are misnomers given the inter subtest scatter: half his subtest scores are very deficient below the 3rd percentile while half are average at the 50th percentile.  His academic scores are more average to low average and generally better than what would be predicted from his ability measures.  This is not unusual in individuals who sustain a TBI [traumatic brain injury] in adult life.  These findings suggest James did have functional effects from his auto injury that among other things resulted in a TBI and continuing medical symptoms, including chronic pain.  He is functional in the three R's, but he has serious problems with executive function, verbal conceptualization, and processing speed. (*Id.*)

8

The psychologist also indicated that Plaintiff had a serious mixed mood disturbance with depressed and hypomatic/restless proclivities. (*Id.*)  She diagnosed mood disorder, ADHD, cognitive disorder, substance abuse, and personality disorder. (Tr. 1325.)

State agency reviewing psychologist John Waddell, Ph.D., assessed the record and Plaintiff's mental capacity in December 2008. (Tr. 681-98.)  Dr. Waddell opined that Plaintiff had moderate limitations in social functioning and maintaining concentration, persistence, and pace.  (Tr. 691.)  Plaintiff had mild limitations in activities of daily living. (*Id.*)  Dr. Waddell concluded that Plaintiff should be limited to unskilled work where he would not have frequent interaction with the public. (Tr. 697.)

On August 21, 2009, Plaintiff began treatment with psychologist Galina Zhurakovski, M.D., at Behavioral Connections. (Tr. 1345-47.)  Plaintiff reported that he was irritable and depressed, and that he had difficulty coping and did not like being around people. (Tr. 1345.)  Upon mental status examination, Plaintiff's speech was well articulated, he did not present with any acute symptoms of anxiety, and overall "he appeared to be at the average level of intellectual functioning . . . and quite 'concrete.' " (Tr. 1346.)  Dr. Zhurakovski, however, opined that it would be very difficult for Plaintiff to be in any workplace or social environment without eliciting some negative reactions from others, and that Plaintiff came across as a person with obvious signs of a cognitive impairment. (*Id.*)  She diagnosed mood disorder and questionable ADHD by history. (Tr. 1347.)  Dr. Zhurakovski assigned a GAF score of 45.[2]  She prescribed a small dose of

---

[2]    A GAF score between 41 and 50 represents serious symptoms, such as suicidal ideation, or any serious impairment in social or occupational functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

antidepressant and recommended psychotherapy. (*Id.*)

Plaintiff returned to Dr. Zhurakovski in October 2009 and reported improvement, having energy to work on his yard, and that anti-depressant medication was helping. (Tr. 1341.)  Plaintiff also indicated that he still avoided people and had difficulty sleeping. (*Id.*)  Dr. Zhurakovski adjusted Plaintiff's medications. (*Id.*)  In January 2010, Plaintiff described mood swings, as well as stomach problems caused by his antidepressant medication. (Tr. 1339.)  As a result, Dr. Zhurakovski  adjusted Plaintiff's antidepressant.  The psychologist reported that Plaintiff was slightly unfocused and forgetful and needed written instructions for medications because he could not remember oral instructions. (*Id.*)  At his next two sessions, Plaintiff reported energy problems and Dr. Zhurakoviski adjusted his medications. (Tr. 1337-38.)

In June 2010, Plaintiff reported to Dr. Zhurakovski that he had run out of Effexor for a week and had immediately started feeling depressed, moody, and unhappy. (Tr. 1336.)  He experienced improvement when he began taking the medication again. (*Id.*)  Otherwise, Plaintiff did not present with complaints, and the psychologist described him as looking healthy, smiling, and pleasant. (*Id.*)  Plaintiff was not able to comprehend and follow instructions regarding paperwork for his social security application. (*Id.*) Dr. Zhurakoviski expressed concern about Plaintiff's frustration because he did not understand the social security application process. (*Id.*)

In September 2010, Plaintiff told Dr. Zhurakovski that he was very stressed, had mood swings, and was losing track of blocks of time. (Tr. 1335.)  The psychologist

10

completed a medical source statement form addressing Plaintiff's mental impairments. (Tr. 1326-29.)  Dr. Zhurakovski described numerous symptoms, including poor memory, mood disturbance, time or place disorientation, social withdrawal, and irritability. (Tr. 1326.)   She opined that he had a marked loss in a range of activities related to understanding, remembering, and carrying out instructions, as well as activities related to responding to supervision, coworkers, and work pressures. (Tr. 1327-28.)

On May 24, 2011, Dr. Zhurakovski reported that Plaintiff was very frustrated with his social security denial and had stopped taking all of his medications, claiming they had not been helpful. (Tr. 1332.)  Plaintiff was polite, but his reactions were slow and he had difficulty communicating. (*Id.*)  The psychologist prescribed medication. (*Id.*)

In June 2011, Plaintiff presented to a crisis facility for increased depression and agitation. (Tr. 1354.)  He was living in the basement of a home with two roommates. (*Id.*)  Plaintiff was withdrawn, depressed, and anxious. (*Id.*)  Plaintiff was diagnosed with major depressive disorder and cannabis dependence. (Tr. 1357.)  Discharge notes indicated Plaintiff was stabilized on medication. (Tr. 1358.)  Plaintiff treated with Dr. Zhurakovski in September and October 2011 at which times Dr. Zhurakovski adjusted his medications. (Tr. 1391-92.)

In May 2012, psychologist James Kelly, M.Ed., assessed Plaintiff's mental status. (Tr. 1452-61.)  After an examination, Mr. Kelly wrote that Plaintiff would be "expected to be able to understand and apply instruction in the work setting consistent with below average intellectual functioning." (Tr. 1460.)  Plaintiff had an average ability to maintain concentration and exhibited a steady pace. (*Id.*)  Mr. Kelly expected Plaintiff to respond appropriately to supervision, coworkers, and normal workplace stress. (*Id.*)

11

On June 1, 2012, Dr. Tishler conducted a review of the updated record. (Tr. 1086-91.)  The psychologist opined that Plaintiff could complete simple, routine tasks without strict daily quotas. (Tr. 1091.)  Plaintiff could have only limited interaction with the general public, coworkers, and supervisors. (*Id.*)

From November 2011 to September 2013, Plaintiff was admitted for inpatient psychiatric hospitalizations on numerous occasions. The admissions generally lasted a few days and occurred in November 2011 (Tr. 1393-99.), December 2011 (Tr. 1590-92.), April 2012 (Tr. 1434-49.), December 2012 (Tr. 1538-65.), January 2013 (Tr. 1524-37.), March 2013 (Tr. 1698-1700, 1664-68), May 2013 (Tr. 1767, 1782-99.), June 2013 (Tr. 1771, 1823.), July 2013 (Tr. 483.), August 2013 (Tr. 527-28.), and September 2013 (Tr. 582-89.)  During these admissions, Plaintiff's complaints included suicidal thoughts and depression.  Numerous inpatient records document marijuana and alcohol abuse and that Plaintiff had run out of his medications.

From around October 2012 through March 2013, Plaintiff sought sporadic mental health treatment, primarily in the form of medication management, at Unison Behavioral Healthcare. (Tr.1720-38.)  At an initial psychiatric examination on October 9, 2012, Plaintiff reported that the main reason for his visit was to reestablish his eligibility for social security. (Tr. 1726.)

**C.**	**Hearing Testimony**

    **1.**	**Plaintiff's Hearing Testimony**

Plaintiff testified at five administrative hearings. (Tr. 1828-65, 1866-1903, 1904-

16, 1917-1966.)[3]  At the final October 2013 hearing, Plaintiff testified that since 2005, he had lived with a series of different roommates. (Tr. 1845-46.)  On average, he stayed in a housing situation for two or three months and then moved. (Tr. 1858-59.)  Plaintiff sometimes failed to take his psychotropic medication, and, as a result, he became depressed, began to "think crazy thoughts," and would have to go to the hospital. (Tr. 1848-50.)  Plaintiff also testified that he would go to the hospital when he forgot to refill his medication. (Tr. 1855.)  He often experienced suicidal thoughts. (Tr. 1850.)  Plaintiff last used marijuana two weeks before the hearing and normally used the drug a few times each month. (Tr. 1856.)

### 2.    Vocational Expert's Hearing Testimony

Mr. Thompson, a vocational expert, testified at Plaintiff's July 2013 hearing.  The ALJ asked the VE to consider a hypothetical individual vocationally situated as Plaintiff. (Tr. 1897-99.)  The individual would be capable of performing work at the light exertional level, except for the follow: no climbing of ladders and the like; frequent kneeling, crouching, and crawling; and no exposure to obvious hazards, including moving machinery and unprotected heights. (Tr. 1897.)  The individual would be limited to work with an SVP of 1 to 2 (unskilled work), where the pace of productivity was not dictated by an external source over which the individual had no control, such as an assembly line or conveyor belt. (*Id.*)  The work also must be repetitive from day-to-day with few and expected changes, no contact with the general public, occasional contact with and no working in team or tandem with coworkers. (Tr. 1897-98.)  The individual

---

[3]  The transcript of the 2008 administrative hearing is not included in the record.

had limited depth perception with the right-eye, but could move his body to accommodate. (Tr. 1898.)  The VE testified that the hypothetical individual would be capable of performing jobs such as a folder, cleaner, and packer. (*Id.*)

## III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).*  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant remains disabled by way of a seven stage process for Title XVI claims and an eight stage process for Title II claims. 20 C.F.R. 404.1594(f) *and* 416.994(b)(5).  For a Title II claim only, the claimant must first demonstrate that he is not currently engaged in "substantial gainful activity." 20 C.F.R. 404.1594(f). The remainder of the evaluation for Title II and Title XVI claims is identical:

- Step 1: The Commissioner determines whether the claimant has an impairment or combination of impairments which meets or equals the criteria of a listed impairment. 20 C.F.R. 404.1594(f)(2) *and* 416.994(b)(5)(i).  If the claimant does, disability will continue. *Id.*

- Step 2: If a listing is not satisfied, the Commissioner must determine whether there has been "medical improvement." 20 C.F.R. 404.1594(f)(3) *and* 416.994(b)(5)(ii). "Medical improvement" is any

14

decrease in the medical severity of an impairment as established by changes in the symptoms, signs, or laboratory findings associated with the impairment. 20 C.F.R. 404.1594(b)(1) *and* 416.994(b)(1)(i).  If there has been medical improvement, the inquiry proceeds to Step 3. *Id.*  If there has been no medical improvement, the inquiry proceeds to Step 4. *Id.*

• Step 3: The Commissioner determines whether medical improvement is related to the claimant's ability to do work–i.e., whether there has been an increase in the claimant's residual functional capacity. 20 C.F.R. 404.1594(f)(4) *and* 416.994(b)(5)(iii).  If medical improvement is related to the claimant's ability to work, the inquiry proceeds to Step 5, and, if it does not, the inquire proceeds to Step 4. *Id.*

• Step 4: If there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, the Commissioner considers whether an exception to medical improvement applies. 20 C.F.R. 404.1594(f)(5) *and* 416.994(b)(5)(iv). There are two groups of exceptions (20 C.F.R. 404.1594(d), (e) *and* 20 C.F.R. 416.994(b)(3), (b)(4)). If one of the first group exceptions applies, the analysis proceeds to the next step. *Id.* If one of the second group exceptions applies, the claimant's disability ends. *Id.* If none apply, the claimant's disability continues. *Id.*

• Step 5: If medical improvement is related to the claimant's ability to do work or if one of the first group of exceptions to medical improvement applies, the Commissioner will determine if the claimant's current impairments in combination are "severe." 20 C.F.R. 404.1594(f)(6) *and* 416.994(b)(5)(v).  If they are not severe in nature, disability ends. *Id.*

• Step 6: If impairments are severe, the Commissioner assesses the claimant's residual functional capacity and determines if the claimant can perform past relevant work. 20 C.F.R. 404.1594(f)(7) *and* 416.994(b)(5)(vi).

• Step 7: If the claimant cannot perform past relevant work, the Commissioner determines whether other work exists that the claimant can perform given his residual functional capacity, age, and education. 20 C.F.R. 404.1594(f)(8) *and* 416.994(b)(5)(vii).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The most recent favorable medical decision finding that the claimant continued to be disabled is the determination dated March 23, 2000. This is known as the "comparison point decision" or CPD.  However, as discussed at Finding 6 below, the undersigned finds pursuant to 20 C.F.R. 404.1594(d) & (e) and 416.994(b)(3) & (b)(4) that a group one exception applies to this prior finding.

2.    At the time of the March 23, 2000 continuing disability review (CDR) determination, the claimant had the following medically determinable impairments: chronic brain syndrome and visual disturbances.  These impairments were found to meet sections(s) 12.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  However, as discussed below at Finding 6, the undersigned finds that the March 23, 2000 determination was made in error, and that the claimant's impairment no longer met 12.02 as of March 23, 2000.

3.    As of March 23, 2000, the date the claimant's disability ended, the claimant had not engaged in substantial gainful activity.

4.    Medical improvement occurred as of March 28, 2000, the date of the prior CDR.

5.    The claimant's medical improvement is related to the ability to work because, as of March 23, 2000, the claimant's impairments no longer met or medically equaled the same listing that was met at the time of the claimant's original determination on April 1, 1994.

6.    Pursuant to 20 C.F.R. 404.1594(d) & (e) and 416.994(b)(3) & (b)(4) a group one exception applies to the prior March 23, 2000 CDR determination.

7.    The medical evidence establishes that, as of March 23, 2000, the claimant has had the following medically determinable impairments: history of traumatic brain injury with alleged residual cognitive effects; bilateral eye right hemianopsia; marijuana dependence and abuse; and major depressive disorder/dysthymic disorder.  Further, as of March 2013, the claimant has also had the following additional impairments: right knee degenerative joint disease; mild right hip degenerative joint disease; and mild lumbar degenerative joint disease.  These are the claimant's current impairments.

8.      Since March 23, 2000, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

9.      Beginning on March 23, 2000, the claimant has continued to have a severe impairment or combination of impairments.

10.     Beginning on March 23, 2000, based on current impairments, the claimant has had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: no climbing of ladders and the like; frequent kneeling, crouching, and crawling; no exposure to obvious hazards including moving machinery and unprotected heights; work with a specific vocational preparation (SVP) of 1 to 2 (unskilled work) where the pace of productivity is not dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt; work that is repetitive from day to day with few and expected changes; occasional contact with coworkers, but no working in team or tandem; and no contact with the general public.  It is also noted that he has limited depth perception in his right eye; however, he is able to move his body to accommodate.

11.     The claimant has no past relevant work.

12.     On March 23, 2000, the claimant was a younger individual age 18-49.

13.     The claimant has at least a high school education and is able to communicate in English.

14.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

15.     Beginning on March 23, 2000, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy.

16.     The claimant's disability ended on March 23, 2000, and the claimant has not become disabled again since that date.

(Tr. 29-47.)

17

# V.  LAW & ANALYSIS

## A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

18

### B.      Plaintiff's Assignment of Error

Plaintiff's only challenge is that the ALJ erred in failing to analyze the content of Dr. Damrauer's psychological evaluation report.  On October 28 and 31, 2008, Dr. Damrauer conducted a psychological examination of Plaintiff and issued a report in which she concluded that Plaintiff was unemployable. (Tr. 973-80.)  The ALJ gave Dr. Damrauer's opinion little weight, noting that the psychologist's I.Q. findings were not consistent with two earlier I.Q. tests. (Tr. 42.)  The ALJ accorded no weight to Dr. Damraruer's blanket statement that Plaintiff was unemployable as it constituted an opinion on a finding reserved for the ALJ. (*Id.*)  Plaintiff maintains that the ALJ ought to have discussed and assessed the content of Dr. Damrauer's report in more detail and points out that Dr. Damrauer's report contained the results of hours of clinical interviewing and the interpretation of multiple psychological tests.

While an ALJ is required to *consider* all of the evidence in the record, it is well established that an ALJ is not required to *discuss* each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Nevertheless, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC

19

assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Because Dr. Damrauer was not a treating source, the ALJ was required only to acknowledge that Dr. Damrauer's opinion contradicted her RFC finding and explain why she did not include any limitations the psychologist assessed in her determination of the RFC.  The ALJ was not required to discuss every aspect of Dr. Damrauer's report.  A review of the ALJ's decision indicates that the ALJ adequately considered Dr. Damrauer's report and explained why she discounted the opinion. (Tr. 41-42.)  According to the ALJ, the results of Dr. Damrauer's I.Q. test results were inconsistent with I.Q. results from two other tests. (Tr. 41-42.)  Indeed, Plaintiff scored significantly higher on I.Q. tests performed by Dr. Tanley and Mr. Johnson. (Tr. 41-42, 333, 1742.)  Additionally, with regard to Dr. Damrauer's statement that Plaintiff was unemployable, the ALJ correctly announced and applied the principle that opinions on issues such as whether a claimant is employable, or "unable to work," are not medical opinions, and thus, not deserving of any particular weight. *See* Turner v. Comm'r of Soc. Sec., 381 F. App'x 488, 492-93 (6th Cir. 2010); 20 C.F.R. §§ 404.1527(d), 416.927(d); S.S.R. 96-5p, 1996 WL 374183 (S.S.A.).

Plaintiff has not directed the Court to any functional limitations that Dr. Damrauer assigned, which the ALJ ought to have addressed.  Instead, Plaintiff highlights Dr. Damrauer's statement that Plaintiff had "serious problems with executive function, verbal conceptualization, and processing speed." (Tr. 979.)  Plaintiff, however, does not

explain how the RFC failed to account for these deficits or to what degree these issues impacted Plaintiff's ability to perform specific work-related tasks.  The RFC included numerous mental restrictions. (Tr. 34-35.)  Additionally, in regard to Plaintiff's reported difficulty processing information quickly and other cognitive impairments, the ALJ noted that Plaintiff was nevertheless able to live independently, ride his bike, drive, shop, and manage his finances. (Tr. 41.)

The ALJ also relied upon numerous opinions from other medical sources that substantially support the RFC.  For example, the  ALJ accorded significant weight to the RFCs suggested by the state agency reviewing psychologists for portions of the record which their assessments encompassed. (Tr. 44, 376-89, 390-403, 681-98, 1086-91.) The opinions of state agency medical consultants regarding the nature and severity of an individual's impairments constitute expert opinion evidence upon which an ALJ may rely. *See* S.S.R. 96-6p, 1996 WL 374180, at *1 (S.S.A.).  Notably, Drs. Waddell and Tishler reviewed the record to assess Plaintiff's RFC in December 2008 and June 2012 respectively, and while doing so, had access to Dr. Damrauer's October 2008 opinion. (Tr. 697, 1091.) The state agency psychologists nonetheless found that Plaintiff could perform tasks as set forth in the RFC. (*Id.*)  Furthermore, the ALJ relied on the opinions of four different consultative psychological examiners, all of whom concluded that Plaintiff could perform at least simple, repetitive tasks. (Tr. 41-42, 45-46, 330-34, 358-62, 1452-61, 1739-44.)

The ALJ sufficiently assessed Dr. Damrauer's opinion and her review of the opinion is supported by substantial evidence.  Remand for the ALJ to discuss further details of the report would prove to be a useless formality.  "No principle of

administrative law or common sense requires us to remand a case in quest of a perfect

opinion unless there is reason to believe that the remand might lead to a different

result."  *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v.

Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)).  Accordingly, Plaintiff's argument does not

present a basis for remand.

## VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date:  September 30, 2015

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the
Clerk of Court within fourteen (14) days after the party objecting has been served
with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to
file objections within the specified time may waive the right to appeal the District
Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas
v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**